**MICHEL LECLER, INC. and Coastal Fabricators, Inc., Plaintiffs,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Citadel Insurance Company, Underwriters at Lloyd's and Insurance Companies in London, Defendants.**

Civ. A. No. 78–915.

United States District Court,
E. D. Louisiana.

Sept. 16, 1981.

Pete Lewis, Slidell, La., for plaintiffs.

Robert N. Habans, Jr., Scott Silbert, New Orleans, La., for defendants.

George S. Moore, defendant Geosource, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CASSIBRY, District Judge:

Plaintiffs, Michel Lecler, Inc. and Coastal Fabricators, Inc., both corporations substantially owned by Michel Lecler, brought this action to recover under a policy of hull insurance issued to plaintiffs on the steel

hull vessel, the M/V SOUNDER, by defendant Insurance Company of North America. Defendant contends that the losses were intentionally caused by the named insureds. Plaintiffs also sued defendant, Geosource, Inc., the owner of Hunt Shipyard, for the value of certain equipment which it alleged was pilfered while the ship was located in the Hunt Shipyard. This matter was tried to the court sitting without a jury on February 19, 20 and 23, 1981. After carefully considering the pleadings, the evidence presented, and the argument of counsel for both parties, I enter the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. The Insurance Company of North America, and various subscribing underwriters issued a policy of hull insurance, number A&P/H–9485, to plaintiffs, Coastal Fabricators, Inc. and Michel Lecler, Inc., which provided coverage on the steel hull vessel, M/V SOUNDER owned by Coastal Fabricators, Inc.

2. Michel Lecler purchased the M/V SOUNDER on behalf of Coastal Fabricators, Inc., primarily for use with a remote control submarine he was developing, the RECORP (see below). The SOUNDER arrived at Lecler's facilities in July 1976. After its arrival, Lecler sent the vessel to Hunt Shipyards for refitting, sand-blasting and painting. The vessel was finished and ready for operation by October 1976. Its last use prior to the fire in question was in October 1976 when it was used to test the RECORP off the coast of Florida.

3. In August 1976, Lecler signed an agreement with Smit International Americas, Inc., in which Smit agreed to purchase all of the assets of Michel Lecler, Inc. and for a new company, Smit-Lecler International Corp. Smit intended its acquisition of Lecler's assets as well as the services of Lecler himself, which were also provided for in the contract, as a way of entering the deep-sea diving market. The agreement which Smit and Lecler signed specifically required that Lecler dissolve Recorp, Inc., the corporate owner of the RECORP, and divest himself of its assets within 120 days of the closing date of the contract. The contract required that Lecler dissolve and dispose of the assets of Coastal Fabricators, Inc., the owner of the SOUNDER, within six months following six months after receipt of notice from purchaser. The deposition of Richard Fredericks, then secretary-treasurer of Smit, which was introduced by stipulation of the parties, indicates that Smit did in fact give Lecler such notice, although he did not recall the date of the notice.

4. The RECORP was a remote controlled submarine, which Lecler had commissioned Chris Nicholson, a young technician to build. It was primarily intended to aid in the inspection of underwater pipelines. Lecler hoped that the RECORP would be the first such device on the market, which would, of course, make it very profitable.

5. In fact, aside from its salvage value, the RECORP device was commercially valueless. In another deposition stipulated by the parties, Williard Searle, former chief salvage officer and diver for the United States Navy, indicated that based upon his extensive experience in developing remote control vehicles for the Navy and as a consultant for private industry, the RECORP was little more than an obsolete toy.

Searle had been hired by Smit to assist it in inventorying the assets of Lecler's diving company, Michel Lecler, Inc., pursuant to its purchase of that company. Although Smit identified the RECORP as a device that it did *not* intend to acquire, Searle nevertheless personally inspected the RECORP and talked with Chris Nicholson as well as Lecler's chief diver concerning the performance of the RECORP. Based upon his examination of the RECORP and his inquiries, Searle testified that the RECORP was overweight and underpowered and therefore was incapable of performing in an efficient manner the jobs for which it had been designed. Searle summarized his recommendations to Smit following his evaluation as follows:

I advised them that the RECORP was essentially valueless. It was a piece of hardware which was a poor copy of things which had been described in *Popular Mechanics* and other open literature.

It was at least ten and perhaps fifteen years behind in being current with modern day technology. It was too big, too heavy, and underpowered.

They were in fact, reinventing the wheel. And unfortunately, the wheel they were inventing didn't have a rubber tire on it. It had a steel rim, speaking in figurative language.

Searle's view was apparently confirmed by a test of the RECORP done in October 1976 off the coast of Florida. Richard Fredericks testified that Lecler offered to sell the RECORP to Smit-Lecler in September of 1976 and that pursuant to that request Smit-Lecler funded a test of the vehicle's capacity off the coast of Florida. According to Fredericks, the test indicated to Smit personnel that, while the RECORP was a reasonable first effort at building a remove-controlled underwater vehicle, it was not an improvement on the current technology and therefore Smit was not interested in acquiring the asset. However, Fredericks indicated that in December 1976 of January 1977, Smit-Lecler *did* offer to purchase the RECORP for $25,000 to $35,-000, approximately what Searle had indicated its component hardware was worth.

6. By January 1977 Lecler was aware that the RECORP had no commercial value. By that time, the test of the device had been completed and Smit had told him that it was not interested in acquiring the RECORP as a commercially viable entry in the remote controlled vehicle market. Instead, it had offered him what amounted to the device's salvage value, $25,000 to $35,000, considerably less than the RECORP's insured value of $250,000. Although Lecler testified that he had an offer from Michigan-Wisconsin Pipeline Co. to use the RECORP later in the year, there was no independent evidence to substantiate such an offer. In fact, Fredericks indicated that to his knowledge, Lecler never entered into such an agreement. I find that Lecler's testimony regarding the Michigan-Wisconsin offer was not credible.

7. After the October 1976 test of the RECORP, Lecler also ran into financial difficulties with the SOUNDER as well. Smit-Lecler refused to charter the boat for an extended diving job in November 1976. Fredericks indicated that Lecler sent out inquiries in the industry regarding the use of the vessel or its sale, but that, to his knowledge, Lecler never received an answer to his inquiries. Lecler testified that he had an "oral" agreement with Paul Vandenburg, the President of Smit International, that Smit would pay Coastal Fabricators, Inc., $250 per day for the duration of the six month job even though the SOUNDER was not used. I find that this assertion was not credible, particularly in light of Lecler's contractual obligation with Smit to divest himself of Coastal Fabricators, Inc. and the SOUNDER.

8. In January 1977 Lecler removed the RECORP from the Smit-Lecler warehouse, where it had been located since the October 1976 tests, and placed it on the SOUNDER. William Van Zee, a former employee of Lecler and first mate of the SOUNDER, testified that Lecler moved the RECORP at the request of Fredericks, who told Lecler that he did not want the RECORP in the Smit-Lecler warehouse because it was attracting too much attention. However, in his deposition, Fredericks specifically denies that he ever made such a request. I conclude that Lecler moved the RECORP on his own initiative. Lecler then moved the SOUNDER from its dock at Lafitte to a canal owned by Arthur Prestonback located off of Bayou Barataria. Prestonback, who was engaged in dredging in the area, told Lecler that he could keep the vessel in the canal for free.

The Prestonback Canal mooring site was in an isolated area with no permanent residences within a mile of the site. In his deposition, Mr. Prestonback indicated that he spent several nights a week in a trailer approximately one-quarter mile away from the vessel. Aside from asking Prestonback

to look out for his boat, Lecler made no other provision for protecting the vessel or the RECORP device.

9. On April 6, 1977 several fires of incendiary origin damaged the SOUNDER and completely destroyed the RECORP, which had been located on the SOUNDER'S stern. The fires were started by a number of fairly simple incendiary devices located in the engine room, rear storage area, and deck of the boat.

10. On or after April 8, 1977, the SOUNDER was further damaged when someone attempted to scuttle the vessel by opening the sea cocks and a manhole in the crew's quarters.

11. In the case of both the arson and the scuttling, it appears that the person responsible gained access to the vessel's compartments with a key, since the vessel's compartments were padlocked and there was no indication of forced entry.

12. On April 28, 1977 Lecler had the SOUNDER towed from Prestonback Canal to the Hunt Shipyard.

13. Pursuant to the request of the Shipyard, on September 30, 1977 Lecler had the SOUNDER towed from the Hunt facility back to Lecler's Technical Sea Services dock.

14. Plaintiffs failed to prove that any of the navigational equipment listed in the stipulation between the parties they claimed was pilfered while the vessel was at Hunt Shipyard was, in fact, ever on board the vessel at the time it was delivered to Hunt Shipyard. Plaintiffs' only witness that such equipment was on the boat when it arrived at the Shipyard was William Van Zee, a former employee of Lecler. Van Zee testified that he visited the ship on at least one and possibly more occasions while it was in the Shipyard. In particular, Van Zee testified that he was present the morning of May 3, 1977 when representatives from Stickney Marine and Breit Marine Surveying came to examine the SOUNDER. He testified that the navigational equipment was on board at that time. I find that Van Zee's testimony in general

lacked any credibility whatsoever. It contained numerous contradictions and inconsistencies. For example, Van Zee's claim that he was present at the May 3 surveys was contradicted by rebuttal evidence that Van Zee was, in fact, in two separate doctor's offices that day complaining of "burning crushing pain" in his right hand and that the following day he entered West Jefferson Hospital for surgery to relieve the pain. In addition, Stickney's surveyor, Peter O'Connell, testified that Van Zee was not present at the survey and that if he had been present his name would have been listed along with that of the Breit surveyor, as having attended the survey.

Instead, the evidence indicates that the navigational equipment was not on board the SOUNDER when it was delivered to Hunt Shipyard. Alan Moore, a Geosource employee, testified that he visited the SOUNDER while it was still in Prestonback Canal some ten days before it was towed to Hunt. He stated that he did not remember seeing the navigational equipment plaintiffs allege was on board at the time and that had it been there he would have remembered it. Further, Peter O'Connell's testimony, based on his handwritten notes for May 3 and May 9, indicated that the pilot house was virtually empty of any navigational equipment, including radios, radar, or compass.

15. With regard to the *non-navigational* equipment, plaintiffs claim was missing from the vessel, there is some evidence that some of this equipment may have been on board the vessel at the time the vessel was located in Hunt Shipyard. Peter O'Connell's notes taken at the time of his survey includes the following items as present on board the ship:

3 20 cubic foot freezers
1 General Electric refrigerator
1 bilge pump
1 space heater
1 electric hot water heater

The list that William Van Zee allegedly prepared when the SOUNDER returned from Hunt Shipyards in September 1977 includes as items missing: a bilge pump, a

hot water heater, a refrigerator and one freezer. However, aside from the list prepared from Van Zee, there is no other evidence that such articles, were, in fact, missing. And in view of Van Zee's general lack of credibility discussed above, I see no reason to give the list any credence. Moreover, plaintiffs have failed to introduce any evidence concerning the value of such items. Even if I were to conclude that the items were taken from the boat while in the Hunt Shipyard, plaintiffs failed to meet their burden of proof in showing their worth.

## II. CONCLUSIONS OF LAW

Louisiana law controls this diversity case. In *Sumrall v. Providence Washington Ins. Co.*, 221 La. 633, 60 So.2d 68 (1952), the Louisiana Supreme Court set out the basic standard to apply to an insurer's defense of arson:

> Inasmuch as the defense is arson, the burden rested upon the insurer to establish by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. It is well settled that the insurer need not prove its case against a plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Proof, of course, may be and invariably is entirely circumstantial. And, in those instances, a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire. *Id.* at 69.

*See Rist v. Commercial Union*, 376 So.2d 113 (La.1979). In further refining that standard, the *Sumrall* court stated what the insurer must prove before the burden of production shifts to the plaintiff:

> . . . motive, plus the incendiary origin of the fire, would, in the absence of believable rebuttal evidence, be sufficient to sustain the affirmative defense pleaded by the insurer. *Id.* 60 So.2d at 70.

In the present case, both sides agree that the fire on board the SOUNDER was arson. The relevant question, then, is whether the insurer successfully proved that Lecler was responsible for the fire.

■ The evidence concerning Lecler's motive for committing arson is overwhelming. The evidence indicated that the RECORP device was a failure and was worth only its salvage value. The evidence also indicates that Michel Lecler was aware of the RECORP's failure. Yet the RECORP was insured at a stipulated value of $250,-000. While there is no evidence that the SOUNDER was overinsured, it was purchased primarily for use in conjunction with the RECORP and was sitting idle since Smit refused to permit its use for Smit-Lecler jobs.[1] In addition, Lecler was under a contractual obligation with Smit to dispose of both the RECORP and the SOUNDER. The evidence indicates that Lecler did not make any effort to dispose of the RECORP before the fire. It appears that Lecler *did* make some effort to dispose of the SOUNDER but was unsuccessful.

In addition to the evidence of plaintiffs' motive, which, according to *Sumrall*, is enough to shift the burden of going forward with the evidence to the insured, the circumstances of the fire point towards the named insured as the party responsible for the arson. As indicated above, approximately three months before the fire the SOUNDER and the RECORP were moved to a relatively isolated canal. If the RECORP was as valuable as Lecler suggests, it is difficult to imagine why he left it in such an unprotected location. The evidence that there was no forced entry into the vessel also suggests that the insured was responsible for the fire. Finally, it appears from the evidence that the person who scuttled the vessel after the fire was attempting to destroy the evidence of arson on board the vessel. The chief person with such an interest would be the named insured.

Plaintiffs failed to suggest any other reasonable hypothesis for the arson. Lecler's

---

1. Even if Lecler did not specifically intend to destroy the SOUNDER, he certainly had an incentive to set several fires throughout the vessel to disguise his intent to destroy the RECORP.

self-serving testimony that he was sure he had many enemies in the diving business was too general to give it any credence. Plaintiffs also attempted to prove that Andy Webb, a former employee who Lecler discharged when he sold Michel Lecler Inc., to Smit, may have set the fire to gain revenge on Lecler. Van Zee testified that Webb told him that he would "get" Lecler for firing him. However, plaintiffs' theory regarding Webb does not qualify as a reasonable hypothesis. Webb testified that he had learned that there were serious problems with the RECORP and that he had talked with Lecler about them. It is very unlikely that he would, in effect, do Lecler a favor by burning the RECORP so that Lecler could collect under his insurance policy. As for Van Zee's testimony concerning Webb's statement, I believe that it is subject to the same credibility problems I have encountered elsewhere in his testimony.

The manner in which the fire was set also indicates that Webb is not a reasonable suspect for the arson. Francis Richards, an insurance adjuster specializing in arson, testified that the incendiary devices set on the vessel were of the type normally used by "torchmen—those who set fires for profit—and are not normally found in the case of a revenge fire. Finally, if Webb set the fire to destroy the RECORP, that does not explain why he would go back and attempt to scuttle the SOUNDER after already accomplishing his purpose.

As for plaintiffs' claim against Hunt Shipyard, since I have already concluded that plaintiffs did not successfully prove that the navigational equipment was ever delivered to the Shipyard or that the other equipment listed in plaintiffs' exhibit No. 3 was, in fact, missing when it left the Shipyard, there is no need to reach the issue whether the defendant, Geosource, Inc., was negligent in its custody of the SOUNDER.

A judgment will be entered accordingly.